# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VERONICA M. PANKEY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 09-3943 |
| PHILADELPHIA HOUSING DEVELOPMENT CORPORATION, | : | |
| Defendant. | : | |

DuBOIS, J.                                                                                                March 29, 2011

**M E M O R A N D U M**

## I. INTRODUCTION

In this case, plaintiff Veronica Pankey alleges that her employer, defendant Philadelphia Housing Development Corporation ("PHDC"), (1) subjected her to a hostile work environment, (2) disciplined her unfairly because of her race and gender and (3) retaliated against her for filing discrimination claims. Presently before the Court is PHDC's motion for summary judgment. For the reasons that follow, the motion is granted.

## II. BACKGROUND[1]

Plaintiff is an African-American woman who began work in 1988 for the PHDC, a non-profit corporation that provides housing-related services to low- and moderate-income Philadelphia residents. (Def.'s & Pl.'s Statements of Undisputed Facts ("SUF") ¶¶ 1, 4.) Over

---

[1] The facts set forth in this Memorandum are presented in the light most favorable to Pankey, the non-moving party.

the years, she worked her way up from Account Clerk to her current position of Accountant II. (Id. ¶¶ 4-5.)

In or about 1990, Pankey joined Local 1971 of the American Federation of State, County, and Municipal Employees ("Local 1971"), the union that represents most non-managerial employees in PHDC. (Id. ¶¶ 10, 13.) The union also represents employees of two other employers: the City of Philadelphia's Office of Housing and Community Development ("OHCD") and the Redevelopment Authority of the City of Philadelphia ("RDA"). (Id. ¶ 11.) The employees in each of the three organizations are separate bargaining units and negotiate separate collective bargaining agreements with their respective employers. (Id. ¶ 12.) Pankey was elected president of Local 1971 in August 2004, (id. ¶ 16), and served in that capacity until January 2010. (Pankey Dep. at 229.)

A. Pankey's Clock-In Practice

From about the time she started work at the PHDC, Pankey performed the same routine each morning she went to work: she exited her car outside of the downtown Philadelphia building that houses PHDC's offices, walked to her desk, dropped off her belongings, clocked in, returned to her car, drove until she found a permanent parking space and then walked back to the office. (Id. at 80-81.) As of 2007, she worked on the 17th floor of the building, meaning her routine included riding the elevator down 17 flights and then up again after clocking in but before she settled in to do her work. (Id. at 85-88.) Pankey's superiors allege that the routine led to her starting work 20 to 45 minutes after she clocked in, (See Def.'s Mot. for Summ. J., Ex. K at PHDC 0114), although Pankey states that "the times could vary." (Pankey Dep. at 82.)

In spring 2007, Pankey's supervisor, James Quinn, instructed her to cease her practice of

clocking in and then leaving to look for a parking space. (SUF ¶ 35.) Thereafter, Quinn would observe Pankey in the morning to see if she was following his instructions. (SUF ¶ 22.) Pankey asserts that Quinn would make a face at or comment to her when he observed her engaging in her morning parking routine. (Pankey Dep. at 78.)

B. Pankey-Quinn Altercation

Later that year, on August 9, 2007, another employee in Pankey's department, Roslyn McCall, complained to Pankey about being assigned work she believed should have been assigned to another department. (Pankey Dep. at 97-98.) Pankey approached Quinn in his office to discuss the assignment. (Id. at 103.)

During the conversation, Pankey spoke in a "tone of firmness and aggressiveness," (id. at 102), and stated, inter alia, that "the other fiscal department staff who have been spending extra hours to complete assignments are jackasses for doing so." (Id. at 109.) At least two PHDC employees not in Quinn's office heard Pankey utter a profanity. (Perez Decl. ¶ 10; Hinkle Decl. ¶ 7.)

The next day, PHDC issued Pankey a one-day suspension. (SUF ¶ 46.) She served the suspension on August 14, 2007. (Id. ¶ 62.) The same day, Pankey filed complaints with the federal Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging discrimination and harassment stemming from the suspension and the comments about her parking practices. (Def.'s Mot. for Summ. J., Ex. K at PHRC 0453-58.)

C. Pankey's Union Retaliation Complaint

In May 2008, Pankey amended her EEOC and PHRC complaints to include a charge that

the PHDC retaliated against her for filing the original complaint. (Id. at 0131-37.) Specifically, Pankey alleged that shortly after she filed the original complaint, the PHDC changed its longstanding policy of allowing union presidents who were actively working to take "no charge" paid leave during work hours for union functions related to the OHCD and RDA, in addition to the PHDC. (Pankey Dep. at 224-35.) "No charge" paid leave is time an employee is excused from work and receives pay without having to use her personal paid leave. (SUF ¶ 98.) The PHDC maintains that its policy was to grant "no charge" leave only for PHDC-related union activities. (See, e.g., Yurkow Dep. at 50-51.) Otherwise, employees had to use their paid leave time or take leave without pay.

### D. The Present Action

Plaintiff initiated the present action on August 28, 2009, filed an Amended Complaint on January 8, 2010 and a Second Amended Complaint on January 22, 2010. On September 1, 2010, defendant moved for summary judgment. The motion was fully briefed on October 22, 2010 and is thus ripe for review.

## III. LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if the moving party "shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**IV. DISCUSSION**

Pankey asserts that (1) Quinn's behavior surrounding her parking practices created a hostile work environment, (2) the one-day suspension amounted to race- and gender-based discrimination and (3) the PHDC changed its union leave policy in retaliation for her filing complaints with the EEOC and PHRC. The Court addresses each claim in turn.

A. Claim One: Hostile Work Environment

Pankey first alleges that Quinn's reprimand for double parking her car – and his subsequent monitoring of her to see if she was complying with his orders – amounted to harassment based on her race and/or gender. She alleges that this harassment created a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. St. § 951 et seq. The Court concludes that Pankey has failed to adduce evidence sufficient to survive summary judgment on this claim.

The analysis of plaintiff's claim is the same under Title VII and the PHRA. Weston v.

Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001) ("Pennsylvania courts have construed the protections of the two acts interchangeably.") Under both statutes, there are five elements that must be satisfied to prove the existence of a hostile work environment: (1) the employee suffered intentional discrimination because of her protected status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same status in the same position; and (5) the employer is liable under the doctrine of respondeat superior. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Huston v. Proctor & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

In this case, plaintiff has produced no evidence from which a reasonable jury could infer that Quinn's behavior regarding Pankey's double parking was motivated by race- or gender-based animus. Pankey contends that other employees were allowed to get breakfast or take a cigarette break while on work time but were not reprimanded. Even assuming, arguendo, that Pankey and her co-workers were "similarly situated" because of their behavior – a dubious premise – three of the six "similarly situated" employees were African-American women. Given the absence of direct evidence that Quinn's behavior was motivated by race- or gender-based animus, no reasonable jury could infer that Quinn chose to reprimand Pankey – but not other African-American women – because Pankey is an African-American woman.

Plaintiff also has failed to adduce sufficient evidence of the second, third and fourth factors to survive summary judgment. First, the actions in this case were neither "severe" nor "pervasive." Conduct that is both far more frequent and far more offensive has been held insufficient to allow a hostile-work-environment plaintiff to survive a motion for summary

judgment.  See, e.g., Kraus v. Howroyd-Wright Empm't Agency, Inc., No. 06-975, 2008 WL 90325, at *13 (E.D. Pa. Jan. 8, 2008) ("Sexually charged comments, one sexually explicit phone call, banter about helping [plaintiff] find a permanent job in exchange for sex, and an attempt to hug her do not show that the workplace was permeated with insults and discriminatory actions."). Second, any effect on the plaintiff was negligible, a fact underscored by her later statements that she intended to continue the practice of double parking.  (SUF ¶ 38.)  Finally, no reasonable person would be detrimentally affected by a single reprimand, particularly where the subject at issue – arrival time at work – is race- and gender-neutral and a common source of concern for an employer.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

Plaintiff has not demonstrated the existence of a genuine dispute of material fact as to whether Quinn's conduct created a hostile work environment.  Accordingly, the Court grants the PHDC's motion for summary judgment on the first claim.

B. Claim Two: Discrimination in Discipline

Pankey next asserts that she suffered unlawful discrimination when she was suspended for one day after the confrontation with Quinn.  The Court again concludes that plaintiff has failed to produce sufficient evidence of discrimination to create a genuine issue of material fact as to this claim.

The framework for evaluating summary judgment motions under Title VII – also applied to PHRA claims – was established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The Supreme Court further explained the framework in Texas Dep't

of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Id. (quoting McDonnell Douglas, 411 U.S. at 802) (citations omitted). Notwithstanding this burden-shifting framework, at all times, the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains with plaintiff. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799 n.10 (3d Cir. 2003); see also Burdine, 450 U.S. at 253.

To establish a prima facie discrimination case, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position she held, (3) she suffered an adverse employment action, and (4) "under circumstances that raise an inference of discriminatory action," the employer treated other employees more favorably. Albright v. City of Philadelphia, 399 F. Supp. 2d 575, 587 (E.D. Pa. 2005) (quoting Sarullo, 352 F.3d at 797). "Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999).

In this case, the parties do not dispute that Pankey is a member of the protected class, was qualified for the position she held and suffered an adverse employment action when she was issued the one-day suspension. The parties disagree, however, over whether Pankey has satisfied

the fourth factor of the prima facie case by producing evidence that an employee of a different race and/or gender was treated more favorably under analogous circumstances.

Pankey asserts that a white male employee, Martin Lewis, engaged in similar misconduct but was punished less harshly. PHDC counters that Lewis and Pankey were not "similarly situated." PHDC has the far stronger argument.

1. *"Similarly Situated": Legal Standard*

To be considered "similarly situated," two employees "must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Bullock, 71 F. Supp. 2d at 489 (citation and quotation marks omitted). Moreover, "similarly situated individuals must have dealt with the same supervisor [and] have been subject to the same standards. . . ." Dawson v. Harran, No. 08-7, 2009 WL 2431343, at *6 (E.D. Pa. Aug. 6, 2009) (quoting Elgabi v. Toledo Area Reg'l Transit Auth., 228 F. App'x 537, 541 (6th Cir. 2007)).

2. *Lewis's Misconduct and Discipline*

In May 2007, Quinn and Lewis met inside Quinn's office to discuss work assignments. (SUF ¶¶ 70-71.) During the meeting, when he disagreed with something Quinn said, Lewis muttered "fuck you" under his breath. (Id. ¶ 70.) The comment was "barely audible" to Quinn, who was standing next to Lewis. (Id. ¶ 71.) The next day, Lewis apologized to Quinn for his comment. (Id. ¶ 72.)

Based on the comment, in August 2007, Lewis received a low rating on his performance evaluation, and Quinn placed a memorandum about the incident in Lewis's employee file. (Id. ¶¶ 73-74.) Lewis was not suspended for the comment, though he was suspended for a day in

2009 when he used inappropriate language in a meeting with his supervisor. (Id. ¶¶ 78-79.)

       3. *Lewis and Pankey Were Not "Similarly Situated"*

Pankey argues that she and Lewis were "similarly situated" because they both cursed during heated discussions with Quinn in his office. (Pl.'s Resp. Br. at 9.) This, however, is where the similarities end. There are several factors that distinguish their conduct, at least two of which are particularly significant.

First, Lewis apologized; Pankey did not. In fact, Pankey's deposition testimony reveals that she did not think an apology was necessary:

> It was okay for Marty to say fuck you and then it was later okay for Marty to come back and say I'm sorry! And you don't call that a coward? Yeah, right? And I'm supposed to say okay? Okay. So maybe if I go back – so is that why you keep asking me if I had apologized to them? No, no, no. Because that's the coward's way out. You stand by what you mean or you fall for anything. . . .

(Pankey Dep. at 200 (emphasis added).) A plaintiff's choice not to apologize can defeat a claim that she is similarly situated to another employee who made a different choice. See Stevens v. Del Webb Cmties., Inc., 456 F. Supp. 2d 698, 710-11 (D.S.C. 2006); see also Green v. Winter, No. 08-140, 2009 WL 3150349, at *10 (E.D. Pa. Sept. 24, 2009).

Pankey argues that she was "never given the opportunity to apologize." (Pl.'s Resp. Br. at 11 (emphasis in original).) This argument is unpersuasive. Pankey and Quinn worked in the same office. She did not need an invitation to speak with him about the incident. Neither, apparently, did Lewis. (See Quinn Dep. at 121 ("Mr. Lewis came to me and asked to speak to me in my office. . . . He apologized for cursing at me.") (emphasis added).)

Second, the only evidence in this case about the nature of the two incidents establishes

-10-

that Lewis's comments, including the profanity he uttered, were "barely audible" to someone standing next to him. (Id. at 120-21.) Conversely, it is undisputed that Pankey uttered profanities in a loud enough tone that at least two employees who were not in Quinn's office could hear her. (See Perez Decl. ¶ 10; Hinkle Decl. ¶ 7.) One employee heard Pankey call her co-workers who worked overtime hours "asses." (Hinkle Decl. ¶ 7.) In fact, Pankey acknowledges telling Quinn that "other fiscal department staff who have been spending extra hours to complete assignments are jackasses for doing so." (Pankey Dep. at 109.) Regardless of Pankey's motivation for her actions – she alleges she was making clear to Quinn her position on an issue of importance to the union – both the loudness of Pankey's comments and her derisive statements about co-workers clearly separate her actions from those of Lewis, such that the two cannot be considered similarly situated.

Thus, plaintiff has failed to adduce evidence that a similarly situated employee was disciplined less harshly and has failed to establish a prima facie case of discrimination under Title VII or the PHRA. The Court grants PHDC's motion for summary judgment on this claim.

C. Claim Three: Retaliation

Lastly, Pankey argues that PHDC retaliated against her for filing complaints with the EEOC and PHRC over the suspension and parking disputes. Pankey contends that shortly after she filed her complaints, PHDC ceased a longstanding practice of allowing her to attend certain union functions during work hours without having to use her allotment of paid leave days.[2] The

---

[2] Pankey also asserts for the first time in her response to the instant motion that the PHDC retaliated by changing the supervisor who approved her leave requests. Without deciding whether this constitutes an adverse employment action, Pankey has not administratively exhausted this claim – she never presented it to the PHRC or EEOC – and cannot do so now because it would be time barred. See 42 U.S.C. § 2000e-5(e)(1) (claim must be brought before EEOC within 300 days

Court also concludes that the retaliation claim lacks evidentiary support and accordingly grants PHDC's motion for summary judgment as to this claim.[3]

A plaintiff alleging retaliation must prove that (1) she engaged in a protected activity, (2) her employer took an adverse employment action against her after or contemporaneous with the protected activity, and (3) there exists a "causal link" between the adverse action and the protected activity. Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). Pankey cannot survive summary judgment on this claim because she has provided insufficient evidence from which a jury could conclude that PHDC took an adverse employment action against her.

Pankey alleges that the PHDC had a longstanding policy of granting union presidents "no charge" paid leave for union functions related to the other employers with which Local 1971 bargained, the OHCD and RDA, in addition to the PHDC. Plaintiff cites only to her own deposition testimony asserting that such a policy existed.

Defendant, by contrast, offers substantial evidence to the contrary. First, the PHDC accidentally granted prior union president John Ray "no charge" paid leave for non-PHDC union business in November 2003 but caught the mistake in January 2004 and docked him three days pay. Thus, he did not receive "no charge" paid leave for his involvement in non-PHDC union

---

of alleged act of discrimination); 43 Pa. Cons. St. § 959(h) (claim under PHRA must be brought within 180 days of alleged discrimination). Additionally, a claim, such as this one, not alleged in the complaint, cannot be raised for the first time in response to a motion for summary judgment. Jeffries v. Ameriquest Mortg. Co., 543 F. Supp. 2d 368, 385 (E.D. Pa. 2008).

[3] Plaintiff alleges in this claim violations of both Title VII and the PHRA. Even if the claim had merit, however, she could not recover under the PHRA because she filed her amended complaint – in which she included the retaliation claim for the first time – with the PHRC more than 180 days after the date when the alleged retaliation occurred. Thus, she has failed to properly exhaust administrative remedies under the PHRA. See 43 Pa. Cons. St. § 959(h).

business.  (See Perez Decl. ¶¶ 37-38; Def.'s Mot. for Summ. J., Ex. K at PHDC 0473-75.)

Second, PHDC employee Evelyn Carter, who served beginning in late 2006 or early 2007 as union representative to District Council 33 ("DC 33"), a regional association of Philadelphia-area unions, did not receive "no charge" paid leave to attend DC 33 meetings during work hours. (Carter Dep. at 101.)  In her previous work as union representative to DC 33, Pankey also was not granted "no charge" paid leave to attend DC 33 meetings.  (See Pankey Dep. at 60, 66-67.)

Third, shortly after Pankey returned to work from about two years of unpaid union leave in 2006, the director of her department, William Yurkow, sent her an e-mail that read, "PHDC's policy is to require approved leave time for any union business transacted by you on behalf of RDA or OHCD during your workday. . . . Please submit leave slips for the time you will be taking to meet with OHCD and the RDA today.  Please also punch out on the [time-keeping] system when doing so." (Def.'s Mot. for Summ. J., Ex. K at PHDC 0103.)

Finally, in September 2006, when the union was negotiating a contract with the PHDC, OHCD and RDA at the same time, Yurkow wrote an e-mail to Pankey that read, "You will be given time to attend negotiations for all three agencies; however, other time spent for union business other than negotiations will need to require use of your own leave time."  (Id. at PHDC 0106.)

Quinn did approve "no charge" paid leave for Pankey for an afternoon in March 2007 for a non-PHDC union matter.  (Id. at PHDC 0242.)  Quinn testified at his deposition that he did so because he held the mistaken belief that Pankey would be attending to PHDC business.  (Quinn Dep. at 148-49.)  The leave slip Pankey filled out (that Quinn approved) did not state that the union matter for which she sought leave was non-PHDC related.  (Def.'s Mot. for Summ. J., Ex.

-13-

K at PHDC 0242.)

Even viewing this evidence in the light most favorable to Pankey, no reasonable jury could conclude that the PHDC had a policy of granting leave for non-PHDC union activity. Pankey was told explicitly on two occasions that the policy was not to grant such leave. Her immediate predecessor was denied such leave. And both she and the current DC 33 representative were denied such leave in analogous circumstances. Given this evidence, the one afternoon of "no charge" paid leave Pankey received without telling her supervisor she was working on a non-PHDC matter is not sufficient evidence on which a jury could infer a policy of granting such leave. Neither is plaintiff's ipse dixit statement that the leave policy was as she stated.

In sum, plaintiff has not presented any evidence that PHDC had a policy of granting "no charge" paid leave for OHCD and RDA matters, which it then changed in retaliation for plaintiff's filing complaints with the EEOC and PHRC. As such, she cannot prove she suffered an "adverse employment action" for filing complaints, and her retaliation claim must fail. The Court grants the motion for summary judgment as to Pankey's third claim.

## V. CONCLUSION

For the foregoing reasons, PHDC's motion for summary judgment is granted. An appropriate order follows.